and the consolidated case 15-1504, Overton v. United States. Mr. Williams. Thank you, Mr. Chief Justice, and may it please the Court. In Brady v. Maryland, this Court established the now-familiar principle that the prosecution must disclose to the defense all favorable and material information. This case involves a clear violation of that principle. Here, the prosecution suppressed information that a serial assaulter of women had been seen acting suspiciously at the crime scene before police arrived. The prosecution further suppressed that this man's girlfriend was in the alley at the time, yet he did not speak to her, and she did not speak to him. If this information had been available to Petitioners at trial, they would have presented an alternative perpetrator theory that centered on this jury, that during October 1984, in this neighborhood, this man committed similar assaults against similar victims. They would have then posited to the jury that the same person who had accosted a D.C. councilwoman in an alley and attacked her so ---- Sotomayor, at the trial, the witness, Mr. Freeman, indicated that there were two people acting suspiciously. He raised an objection that those names had not been disclosed. The prosecutor explained his reasons for not disclosing the names, and defense counsel chose to say, I'll get them on the ---- I'll call the witness and get the names myself, and then he dropped the ball. What also occurred was that these ---- this name was given to him as a ---- was given to him and all defense counsel as a possibility within the materials that were disclosed, that Mr. McMillan had been on the scene and no follow-up was done. How can we say that it was undisclosed or not made available in light of those record facts? Sure. So let me begin with what the prosecutor said during that colloquy, which is at page 63 of the Joint Appendix. The prosecutor said that his view was that this was not Brady. So he made the statement that this was not Brady information and that he had adhered to his Brady obligations. This Court made clear in Banks v. Dredge that a rule that the prosecutor may hide and the defense must seek is untenable under Brady. That's essentially what happened here. In so doing, Justice Sotomayor, the prosecutor went further, and he made statements that perhaps not deliberately, in fact, still did mislead the defense counsel about the probative value of this information, because he said, first, that Mr. McMillan had no association with the garage. That's not true, and the information suggests that it wasn't. And then further, he said that Mr. McMillan was only at the scene approximately 90 minutes after the crime occurred. And, of course, the prosecution was the only entity in that colloquy that was aware of information that this crime may have happened only 30 minutes after the crime occurred. The way we view this evidence, Your Honor, is that really the alternative perpetrator theory depends on five pieces of suppressed information. Yes? Ginsburg. But was the name disclosed during the trial? I don't think it was ever disclosed during the trial, Justice Ginsburg. It was only disclosed in the form of the statement of James Michael Campbell, whose trial was severed and then he pleaded guilty later. James Michael Campbell gave a statement that the prosecutor in this case is later described as the most far-fetched. I believe one of the detectives used a more colloquial phrase that I shouldn't repeat at the Court to describe the statement. It involved people that nobody else put in the crime scene, which, by the way, includes Mr. McMillan. Nobody else, no witness, put him in the crime scene. And people doing things with golf clubs, nobody else described a golf club involving a gun, nobody else described a gun. It was just fantastical. And so the defense counsel had no reason to believe, and this goes back, Justice Sotomayor, to I think your initial point. Defense counsel had no reason to believe that McMillan had been there acting alone, that he was there without any members of this purported group attack. And that's critical. Would all of the defendants, this had, what, something like ten defense counsel? Yes. Ginsburg. Would they all have to agree to go this route if they had the information, if it was turned over as braiding material? Some might still say, I'd rather go with not me, maybe them, instead of the alternate perpetrator. Yes. Yes, Justice Ginsburg. First, let me say, I don't think they would have all had to do it. It would be enough if a substantial number did it. But let me further add, I think they all would have done it. And the best evidence for that is that Michelle Roberts, who is a leading criminal defense lawyer in the city at the time and was until very recently, she also had one of the weakest cases against her client, a case so weak that the government now says it is perfectly logical that he was acquitted. And she testified in our post-conviction hearing that if she had been aware of the McMillan information, she would have pursued an alternative perpetrator defense. So we think the evidence in this case suggests that all of the Petitioners would have developed this theory and run with it. And if I may add, I think one of the reasons why they would have done that is that it's not that much of a difference from the not me, maybe them defense. Surely, in any criminal case, when you have an eye, a purported eyewitness who does not identify your client, in closing, any defense counsel will identify that to the jury. Sotomayor, I'm sorry, but I, I, my greatest difficulty with Mr. McMillan is that clearly his 92 crime, which was decades after this crime, suggests a similarity that would have been very potent at a trial. But the disclosure of this Brady of Mr. McMillan wouldn't have led to the introduction of that later committed crime. So what we're left with as an alternative theory is robberies of two women, neither of which were in any way identical to this crime. All of the defendants had crimes of violence and robberies. So their criminal activity was just as bad, if not worse in some cases, than Mr. McMillan. Why would he have been a likely source as an alternative perpetrator, particularly as a sole perpetrator, when he was seen with at least one other person? He wasn't alone when he was seen. He was seen with another man. There's no suggestion that the other man was involved. So how, how does he become such a potent alternative in light of those facts? He's just like the defendants. He is with another person, so being a solo perpetrator is not a natural conclusion. So how do we get him to be the other person? Well, sure. To be clear, our alternative perpetrator theory is an alternative one or two perpetrator theory. We would not fight the notion, and I don't think defense counsel at trial would have fought the notion, that it was McMillan, probably with the assistance of his confederate, who was seen in the alley with him. But let me go back to the foundation of your question, Justice Sotomayor, which is what differentiates McMillan from other people in this neighborhood and from the defendants? McMillan's two other assaults of women were incredibly violent. Specifically, his assault of a D.C. councilwoman, which took place in an alley, was so violent and so ferocious that the victim yelled murder, and that was why people came to her aid. She naturally thought, and she told this to the Washington Post, she naturally thought that this person wasn't just trying to take her purse, that he was trying to kill her. And that would have been powerful evidence that Petitioners could have used at trial. They could have put this D.C. councilwoman on the stand and had her testify to her opinion about what was happening to her, her lay opinion. That would have been powerful evidence. I'd note, just in regards to the Petitioners' criminal histories, Your Honor, the government never suggested that those criminal histories were admissible at trial. They never suggested that those crimes bore any resemblance to this crime. And remember, the government's theory was that this was a group attack. So individual crimes that individual people may have done don't really speak to the government's theory. Here, we have a very powerful theory based on McMillan's own prior crimes. Alitornative perpetrator theory does seem completely inconsistent with the defenses that were put on at trial. I'm not sure how you can say that they could have used both. But in order to convince the jury to accept the alternative perpetrator theory, wouldn't it have been necessary to convince the jury that Olson and Byrd pled guilty and were sentenced to substantial prison sentences for crimes that they didn't participate in at all, and that all of the other witnesses who described this group attack, including at least one who doesn't seem to have the 14-year-old boy who doesn't seem to have impeachment evidence, were perjuring themselves on the stand? That's a pretty substantial burden to overcome, isn't it? We think that there is definitely a reasonable probability that the jury would have had reasonable doubt, and that's the standard, whether or not this jury would have had reasonable doubt and whether or not there is a reasonable probability that it would have had it. Even in light of these purported eyewitnesses. Let me start with Olson and Bennett, then I'd like to talk about Thomas, then I'd like to go, if I may, to the beginning of your question, Justice Alito, because I think it speaks to the lack of incongruity between these two defenses. And I'll get to that. I promise I will get to that. Let's start with Olson and Bennett. The best reason that a jury would have to disbelieve Calvin Olson is that Calvin Olson himself denied participating in this crime for months. He wrote letters to a judge, to a D.C. commissioner, that he had not been involved in this crime and that his initial statement was false. He only pleaded guilty after he himself was sexually assaulted in jail and his motion to suppress was denied. Harry Bennett received a similar deal. He did not go through similarly awful circumstances, but Harry Bennett was facing multiple other charges that brought with them significant jail time. And he only pleaded guilty to get rid of, well, to diminish those other charges. So a jury would think relatively little about those witnesses. Mr. Thomas, I'm going to say the same thing to you, Justice Alito, that a jury would think relatively little about those witnesses. The jury acquitted two defendants that these witnesses put in the case. Going to Mr. Thomas, I completely agree, Justice Alito, that Mr. Thomas, unlike the other purported eyewitnesses, does not have an immediately obvious reason to lie, no immediately obvious reason to fabricate testimony. But his testimony, A, differed from every other purported eyewitness, B, changed dramatically over time, and C, is inconsistent with the objective crime scene evidence. Mr. Thomas testifies to one of the Petitioners striking Mrs. Fuller and then seven Petitioners simultaneously attacking her. If you look at the forensic evidence in this case, there's no reason to think that she was simultaneously attacked by seven people. I would direct you to page A1191 in the hard copy appendix. That is a diagram of the injuries to Mrs. Fuller. Anybody looking at that diagram would not think that a group attack had occurred.  Alito, wouldn't it still be difficult to explain how Thomas came up with a theory that would be a complete fabrication? It's not just that it wouldn't be just a question that he was mistaken about things or he might have exaggerated or something like that. It would be a complete fabrication with no obvious motive. Wouldn't that be true? Well, first, defendants at trial did try to point to a motive, that Mr. Thomas was a relatively unpopular kid who had gotten picked on quite a bit. But I agree that there is no immediately obvious motive for the fabrication. What I would add, Justice Alito, is two points. First, Mr. Thomas came to the defendant's attention – came to detectives' attention and the prosecution's attention very late in the day. There was a huge amount of information available at this – about this case by that time. All of the Petitioners had already been arrested. So for him to stand up there and tell police, oh, it was these seven or eight people, that's not rocket science. That's saying what was already available in the community. I'd like to – Could Mr. Thomas ever recant? No. Mr. Thomas has not recanted. Mr. Thomas has not recanted. If I may, Justice Alito, I'd like to go back to the very beginning of your question, because I would like to explain how we don't think there is that much difference between what – a lot of what the defense counsel tried to do and also using the alternative perpetrator theory. The one thing that defense counsel did in their original trial, which was devastating, by the way, but that they would not have done in – if they had access to the suppressed information, is they would not have actively bolstered the prosecution's witnesses. They did that over and over again, and the lead prosecutor took advantage of that in his rebuttal closing. He said, and I believe this is at Joint Appendix page 185, something to the effect of, well, look at what these defense counsel told you. They told you the believable witnesses are the ones who say that my client wasn't there, and the unbelievable ones are the ones who said that my client was there. That's not a defense. Well, why wouldn't that have happened anyway? I mean, even if you had this alternative perpetrator theory, there's still a lot of defendants with a lot of lawyers with – it seems still a strong incentive to point at the other folks and say, it was them, it wasn't me. Justice Kagan, it would not have been a motive to go so far as to bolster the other witnesses. The alternative perpetrator theory centered on McMillan would be powerful evidence to say, look, this is the story that we think you should consider about what happened. This is the driver of reasonable doubt to you, the jury. Here's an entirely different alternative account of this crime that differs from what the prosecution is telling you. And they would use that to show, look, not only is this a reason to disbelieve all of the prosecution's witnesses, but this is also a reason to disbelieve the specific witnesses that have identified my client. Alitono, Jr. Well, lawyers are used to arguing in the alternative, but other people are not, and it's really hard to see how the defense argument could be. This was – this crime was committed by McMillan and another – and a confederate of his. But if you don't believe that, it was committed by the group, but I wasn't part of the group. It's really hard to do that, isn't it? And if I gave the impression that that's what they would be arguing, I apologize, because that's not the argument that I think would be done here. The argument would be McMillan is the most likely alternative perpetrator. He is the reason that you should have doubt about this prosecution's case. These witnesses are flawed. These witnesses had motivations to give testimony. There are reasons to doubt them. And McMillan is the obvious reason why they are all lying. But it is still the government's burden to prove guilt beyond a reasonable doubt. And if you look at this government's case, if the government can only point you to – you know, for example, the government can only point you to Cary Elaby, Harry Bennett, and Calvin Alston, you should doubt their testimony for the same reason that you would doubt that this crime committed the way they described it at all, because of Mr. McMillan's presence in the alley, Mr. McMillan's suspicious behavior. So that's the way we think that they would all work together. I would also add that the Court should consider the withheld evidence cumulatively. We not only have the McMillan information, we not only have the statements from The body was found, but we further have information that undermines the investigation. And this would have further diminished the credibility of the prosecution and the detectives. It would have given the jury further reason to believe that these witnesses were flawed and they were the result of a flawed investigation. Kennedy, you have so much to cover, I don't want to interrupt, but why, if McMillan was the perpetrator, would he have been hanging around the scene? That really concerns me. Why would you – if you commit a murder, you don't hang around for an hour. Well, we think that there would be two reasons. And first, he didn't hang around for an hour. He was only at the crime scene for approximately five minutes, according to – But it was – it was – it was 30 to 60 minutes later. We would say it was most likely 30 minutes later that he came back in. We would say that there are two apparent reasons why he would have come back in. The first and most likely is, remember, Mr. McMillan was hiding something under his jacket, and the object used to commit the sodomy was never found. Defense counsel would have argued to the jury that what he was trying to do was come back to the alley and deposit the object used to commit the sodomy back in the garage. The other reason he might have returned is he mistakenly believed that he had left some identifying information about himself inside that garage, and he would want to remove it. But the last point, Justice Kennedy, and I think this is critically important, if you ask any criminal defense lawyer, especially one defending a case involving a violent crime, if he's happy with a defense that depends on his client being clever, they would tell you they are not. Criminals are not clever. And this Court reasoned in Kiles v. Whitley that you should not minimize the importance of alternative perpetrator evidence merely because it would require you to believe that the alternative perpetrator was shrewd and sophisticated. Mr. McMillan was not shrewd and sophisticated, and our defense does not depend on it. Instead, our view is that Mr. McMillan was the kind of person who would commit this type of crime. He was an incredibly violent person. His crimes at the time, even in 1984, depict incredible violence, and that the jury would have heard about that testimony, would have wondered what he was doing in the alley at that time. Why, if he had an innocent reason for being in the alley at that time, did he not speak to his own girlfriend who was there? That's peculiar. The jury would have instead really wondered why was he there. And the answer would have been it wasn't for an innocent purpose, it was for an illicit purpose, it was for a criminal purpose. Alitoso, could I ask you a kind of a picky question that relates to the Watts-Lucci evidence? Part of the argument there is that only one or two people could fit in the garage, but I don't see why. Why would that be so? It's big enough for a car. It's big enough for more than one or two people. So if it's okay with the Court, after I answer this question, I'd like to reserve the balance of my time. But to answer your question, if you look at JA30 and that diagram of the crime scene, you'll see that there is a large amount of debris in that garage. I think it's not impossible that there could only be – that there could have been more than one or two people, but the idea that there could be multiple people in there committing a crime at that time, along with Mrs. Fuller being on the ground, that is what is unlikely. And I'd point out that in the post-conviction hearing, the lead prosecutor on the stand agreed with us that it was highly unlikely that there was a large group in the garage with the doors closed if the crime was being committed at 530. Thank you. Roberts. Thank you, counsel. Ms. Rice. Mr. Chief Justice, and may it please the Court. The jury repeatedly deadlocked as to Russell-Oberton, telling the Court it would be impossible to reach a verdict and returning a conviction only after multiple assertions of impasse and 40 to 50 additional votes. In this incredibly close case, the government not only wrongfully suppressed evidence of two alternative perpetrators, but also withheld critical impeachment evidence concerning a key witness against Overton, Carrie Elaby. The case against Overton was especially weak, and Elaby's testimony played an especially important role in that case. I'd like to begin by briefly addressing the weaknesses in the government's case here. At trial, the government presented three key witnesses against Overton who placed him in the alley during the attack, the two cooperators, Alston and Bennett, and Carrie Elaby. All of those witnesses had serious credibility problems, and their stories diverged in several significant respects, including, among other things, about who was involved and what role they supposedly played. At the same time, another purported eyewitness, who the government later emphasized as the key to its case, affirmatively denied seeing Overton in the alley during the attack, even though Overton is exceptionally tall, and the witness knew him personally. Which one was that? That was Maurice Thomas. That is not, taken together, a strong case, and the jury acquitted a defendant, Alfonso Harris, who the two cooperators squarely implicated in the crime, confirming that the jury had serious questions about their testimony, even without the suppressed evidence. Indeed, even the lead prosecutor recognized that Harris' acquittal meant the jury simply was not willing to convict based on Alston and Bennett alone. And that leaves Carrie Elaby as the only additional witness who claimed to have seen Overton participate in the attack as the center of the government's case against Overton. And the government wrongfully withheld evidence that Carrie Elaby had persuaded another witness to lie to investigators, to implicate someone in the crime by falsely claiming to have heard him confess. That suppressed impeachment evidence is distinct from any impeachment to which Elaby was subject to trial because of what it indicates about her motives. Lying to protect someone is understandable, but lying to implicate someone in a horrific crime is malicious. And Elaby's willingness to encourage someone else to lie strongly suggests she would have been willing to lie to implicate someone herself. And that she may have been doing exactly that before the jury at trial. Ms. Ruggiero. Did the government give nothing at all to the defense about Elaby, or did they just give a truncated file? Or was there a separate file they didn't give? So the government did turn over Elaby's grand jury testimony, and the defense cross-examined her on some inconsistencies between that testimony and her testimony at trial. But the government didn't turn over this piece of impeachment evidence about her having persuaded another witness to lie in the investigation. That wasn't redacted, but it was on a separate notepad or something? It was in the prosecutor's notes, yes. And the prosecutor at the post-conviction hearing acknowledged that he had this information, that it's the kind of thing he normally would have brought out probably in the grand jury testimony, and that it just slipped off his radar. And that information was categorically distinct from the type of impeachment to which Elaby was subject at trial. The matter of Elaby that you were talking about, this is what the government says about that, and I just wondered what your reaction was to it. The government responds, Elaby was not fabricating evidence. Rather, she was creating false corroboration for something that was true. Well, two points on that. I would say, first, there's a substantial question, at least as it was before the jury, about whether this conversation she claimed to have had with Alston, which the other witness falsely corroborated to investigators, actually happened. She was asked about this on cross-examination. I'd say, frankly, her testimony on this is quite confusing and self-contradictory. The prosecution later said, well, we had other confirmation that that conversation happened, but none of that was before the jury. That was what the prosecutor himself knew from having spoken with the witnesses about it. But what is absolutely clear on the record here is that the other witness, Kay Porter, had absolutely no knowledge of this supposed conversation. She had no independent basis for knowing any of the facts that she claimed to have heard in that conversation. That was completely false. Both Kay Porter and Carrie Elaby acknowledged as much to investigators, and the investigators were aware of that and simply didn't turn it over. Kagan, you're kind, Ms. Rice, because I would have said creating false corroboration is fabricating evidence. Oh, and I would emphatically disagree, emphatically agree with that. Thank you, counsel. Mr. Dreeben. Mr. Chief Justice, and may it please the Court. This Court can have confidence in the integrity of these verdicts. The evidence of a group attack was strong and was corroborated by multiple sources who personally witnessed the planning, carrying out, and culmination of the attack. The evidence of the third-party perpetrator that Petitioners have now put before this Court is weak and speculative. There is no reasonable probability that even if Petitioners joined hands and put on this evidence that a jury would have occurred, that no group attack happened at all. Now, the centerpiece of the government's evidence of the group attack consists of six witnesses. Two of them, Alston and Bennett, are participants in the crime. They came before the jury. They pleaded guilty to murder and attempt in manslaughter. They described their roles in the attack. They described the roles of the Petitioners. Their testimony was not 100 percent in accordance with each other. I think the Court would be quite surprised if it was. This was a fast-moving, chaotic event with mostly teenagers and people in their young 20s, and the fact that memories diverge is a sign that they were telling the truth as they recalled it, not that they were fabricating evidence. The group attack was further supported by the testimony of two witnesses who, as was described in closing by Alfonso Harris's lawyer, had no motive to lie, no skin in the game. Ginsburg. Ginsburg. Can we go back to your first two? The two who confessed and testified for the prosecution, they placed two people that the jury acquitted in the gang, is that not right? That is correct. So the jury, at least to that extent, did not believe what these witnesses said. Well, there are two separate questions, Justice Ginsburg. Whether the jury believed everything that Alston and Bennett said, and the question of whether they believed that a group attack occurred. Petitioners can only raise any question about the verdict if they have a viable theory that no group attack occurred at all. Their theory is that it's the guy who was never seen with the victim, never seen in the garage. It's McMillan, not a group. Now, the question of who was in the group is a different matter altogether. And the defendant who was acquitted, Alfonso Harris, Monk Harris, had a variety of things going for him that the other defendants did not. He presented five alibi witnesses that the government was not as successful. Justice Alito suggested earlier that a defense counsel might take the position there's evidence that indicates McMillan was the one who did it. But at least my guy didn't. My guy was not part of any gang. So it's not necessary to say, this is it, I'm putting all my marbles on McMillan. A defense counsel could say, McMillan is the most likely, but in any event, my client wasn't there. Dreeben. Dreeben. Sure, Justice Ginsburg. Defense counsel can run alternative arguments, but to the extent that they depend on saying no event happened and any event, if you believe the government's witnesses, my guy wasn't one of them, is weaker. But I don't even think that that's the issue for the court to decide. The issue for the court to decide is whether the undisclosed evidence about McMillan, if it had been disclosed, would create a reasonable probability that the jury would have said no group attack at all. These defendants were really, you know, there's a reasonable doubt whether any group attack occurred. It really was this one guy doing it. And I want to see. Sotomayor, it's a hard case about whether it was one or more perpetrators. More than likely, more than one. The question is which ones. We know they acquit two, the jury, and on two of them, they deliberate longer. And they, I believe, report not being able to reach a verdict on Overton and Turner. So something was holding them up with respect to those two defendants. If that's the case, why would it take very little to say that at least with those two defendants, all of the cumulative effect of the withheld evidence reasonably could have made a difference? Justice Sotomayor, let me start first with what actually happened in the deliberations, because you can't understand what's going on with Turner, Chris Turner, and Overton unless you understand that the jury deliberated carefully, convicted six defendants and acquitted two defendants after going through an elaborate process of considering the evidence in a six-week trial, sending out a variety of notes that all required consideration of evidence, and culminating in a request to see Yarbrough's videotaped statement, which he gave early on in the investigation, in which he describes the group attack as a pincer movement with two groups of people moving out of the park surrounding the alley, 8th Street and 9th Street, and commencing the attack. So by the time that the jury had convicted, after watching the Overton – the Yarbrough video again, they had concluded that a group attack occurred. They had found evidence sufficient to convict beyond a reasonable doubt on six of the defendants, two of them, Lisa Ruffin, Monk Harris. They said there's not enough evidence to tie them in. I think the evidence against Lisa Ruffin was particularly attenuated, and the evidence against Alfonso Harris was just different, as we described in our brief. So by the time the jury is deliberating about Overton and Chris Turner, they've already decided beyond a reasonable doubt that a group attack exists. Kagan' Well, Mr. Dreeben, of course that's right, because that was the only theory in the case. And the question is what would have happened if the prosecutors had given over this evidence, such that an alternative theory of the case could have been proposed. I mean, one of the things that you get when you read these briefs and when you read the transcripts is this was kind of guaranteed to be bad for the defendants in the sense that without any alternative theory, it was a circular firing squad. And it was, you know, you should believe the guy who doesn't incriminate me, but of course you should believe him as to everybody else. And all ten of these people saying this, it created the worst of all possible worlds for the defendants. And I think what they are saying now is, as compared to that, of course we would have run with this alternative theory, and it would have been a completely different trial. Dreeben So, Justice Kagan, it's not actually accurate that they had no alternative theory. Rouse, who is the defendant who committed the culminating act and has four separate people testifying that he did it, ran the most obvious alternative perpetrator defense, the one that was readily available to all of the Petitioners. Alston and Bennett are getting up on the stand and saying, I participated in this attack, so did all these other people. That's a classic defense strategy, is to say they've admitted their guilt, now they're trying to spread the blame in order to diminish their culpability. And Rouse's counsel got up at closing argument and said, the way the crime unfolded is that Harry Bennett, Calvin Alston, and Daryl Murchison did this on their own. They're throwing my client in, in order to mitigate their own culpability. So they had the most obvious alternative perpetrator defense. What they're now talking about is one that would require the jury to disbelieve Melvin Montgomery about the way that the attack originated in the park. Maurice Thomas, a 14-year-old, which they admit today, had no reason to lie about what he saw. One of the defense counsel described him as walking by, looking in the alley, and seeing the beginning of a murder in progress. Counsel stated today that Maurice Thomas changed his testimony from the grand jury to trial about where he stood. That is not true. If you look at the record, he always described the group that was attacking the victim, who he did not know until he heard her call out, help, somebody help me, when the Petitioners attacked her. There was a group standing behind it in the alley further back who he could not see. And this is one of the reasons why I think to return to Justice Sotomayor's question about Overton and Chris Turner. Chris Turner is not making any individualized argument here at all. He's – for him, it's alternative perpetrator McMillan or nothing. Now, Overton is making a separate argument that I wouldn't have been convicted because Maurice Thomas, who knows me, didn't see me in the alley, and I'm 6'6", and he surely would have seen me. But what Maurice Thomas is describing as a 7th grader walking by an alley and seeing seven people begin to beat on someone who's screaming for help is that I looked at it, my attention was drawn. His credibility, I think, is enhanced by the fact that he says I identified four of them positively. Three of them, Chris Turner, Smith, Hollywood, and Dirk, Harry Bennett, I think that was them, but I'm not sure. He stuck to that testimony throughout. He didn't embellish. He didn't enhance. He described what he saw, and he was there for only a short period of time. So naturally, he was not able to recognize everybody that possibly was on the scene. So I think, Justice Kagan, what you have here is a case where, yes, the defendants did point the finger at each other. They really had no choice. Yarborough has a videotaped confession that's going to come in, in which he tries to distance himself from the events that occur in the alley, but he describes the same unfolding of the attack that Alston and Bennett and Montgomery described. They're standing in the park. They're singing the Chuck Brown song. Catlett is singing it. Steve Webb is banging out the beat. They're talking about getting paid, which is a euphemism for robbery. Someone points across the street. Alston testifies it's him. Montgomery isn't able to say who it was. Says, let's go get that one. Montgomery, who, by the way, is kind of connected to Overton because Overton is the godparent of his daughter, Montgomery testifies, I saw Overton point across the street, and I looked in the direction that he was pointing, and I saw a woman there. He doesn't say, he doesn't exaggerate and say, I know who Overton was pointing at, but he describes what happens. Then he describes Overton and Catlett leaving towards the Ninth Street side of the alley, while Rouse and Charles Turner, Fella, leave towards the Eighth Street side of the alley. That is entirely consistent with the testimony about the way that the crime unfolded of Alston and Bennett. So I think for Overton to say that there's no other evidence besides Cary Elaby, against whom the incremental impeachment was not significant, is wrong. There's Melvin Montgomery describing how he's there in the park. Now, Overton also offered an alibi that was completely discredited at trial. He testified that a woman named Maria Michaels was with him in the park at around 2.30, that he got very drunk and he decided to go home with her, and he went home. And at home, his grandmother and his sister saw him. His grandmother's testimony at trial was basically eviscerated by the fact that she admitted that her daughter had to tell her what to say. And Overton's sister did back up the alibi, but she's a family member, and the testimony that they offered is directly contradictory to the way that Montgomery describes Overton's behavior in the park. Overton also was put in a jail cell with Chris Turner, and the two of them are talking, and a detective testified about what they are saying. Chris Turner later took the stand and corroborated that. Sotomayor, Mr. Dreeben, why did it take the jury longer? Dreeben, this was a six-week trial with 10 defendants, as Your Honor pointed out. The evidence was extremely compelling against defendants like Rouse, Catlett, and Yarbrough. Even still, the jury did what you want a jury to do. They asked to see testimony, they asked for clarification on instructions, they deliberated carefully, they returned an initial verdict, acquitting two of them, convicting six of them. But we don't know how the trial would have shaped up and how the jury would have reacted if the defendants had put on this alternative theory. You can say, well, it probably would have failed, but the test is only, could a jury believe this scenario? Not would they, but could they. So the test, Justice Ginsburg, is whether there is a reasonable probability of a different outcome defined as an outcome in which this Court's confidence is undermined that the jury would have convicted. The Court has made clear in Agers and in Strickler that it's not might have reached a different verdict. It's not that low of a standard. It's also not a preponderance of the evidence. It's not that high of a standard. But if you read Strickler very carefully, I think this is the best case that really illustrates it. Sure, various pieces of exculpatory evidence, had they been offered by the defendants I submit they never would have offered the McMillan theory and I'll explain why. But had they offered that, you can speculate that perhaps some juror might have had a reasonable doubt, but that is not the same thing as having your confidence undermined that the jury still would have concluded that a group attack occurred. I've talked about four of the witnesses who saw it, the two cooperators who pleaded guilty, described their own acts. I've talked about Maurice Thomas, the seventh grader who walks by, sees the beginning of the crime unfolding in the alley. That's what Overton's counsel said to the jury at closing. And I've talked about Melvin Montgomery, who's in the park, who describes how this pincer movement unfolded and began. Carrie Elleby, Linda Jacobs, two girls who are looking for Smith, Hollywood, because Carrie Elleby is seeing Smith, go into the alley, they see the attack, they describe. Kagan can I ask about the facts of this? It's a similar question on the other side to the one that Justice Alito asked about the garage. Just when I sort of think of the facts, it's 5 o'clock on a Monday, it's on H Street, a busy thoroughfare. There are, in the prosecution's view of this, there are 15 or 20 people carrying out this pincer movement as you describe it. There's an alleyway, but it's backed up by houses on both sides. Why is it that in the end, the government's witnesses were two people who were charged and were making a deal with the government and who had reasons to make a deal with the government, a couple of really drug-addled people, and a 14-year-old boy? I mean, you would think that in this community, there would be so many people who would see the kind of attack that the government suggests happened here. And why wasn't that the case? So first of all, Justice Kagan, the government looked as hard as it could for witnesses. Not all of the buildings that back up on this alley are residential buildings. There's a bank, it doesn't have windows, there's brick walls. But I think that probably the best explanation of why nobody came forward or saw it or heard it is community fear. There was a gang that existed in the park at 8th and H Street. It engaged in a fair amount of crime. If you look at the petitioner's criminal histories, you'll see that for many of them, this was not their only robbery in the area. And the government worked as hard as it could to try to get witnesses. The way that the government actually found out that a group attack occurred is because a woman anonymously approached a police officer on the night of the crime and said she saw Clifton Yarbrough standing by the alley on 9th Street, turning his head back and forth like a lookout. And the police picked up Clifton Yarbrough and they interviewed him. And you can see this is on October 4th. This is the very first time that the government gets any inkling that this is a group attack with a large number of people. The crime scene doesn't tell you that. They learn it for the first time from Clifton Yarbrough, who's distancing himself naturally and saying I wasn't really part of it, but he's describing the same thing. We wanted to get paid. Let's go get that one. She's got big money. And then later when he gives his videotaped confession, he says the same thing. Now, he is attempting to extricate himself, of course, saying he wasn't really involved in any of the violence, but he's describing the same group attack. So I think the community here was basically under siege. This was a crisis. And witnesses don't come forward necessarily when they may have fear about it or they just don't want to get involved. Remember Maurice Thomas. He's the seventh grader, no motive to lie, no skin in the game, no deals with the government. His family doesn't really want him involved in this. He goes home and he tells his aunt, I just saw a beating in the alley. She says, don't tell anybody else about what you saw. His family doesn't bring him forward when he knows that the prosecution is evidence that it's seeking evidence about the crime. Eventually, the prosecution has heard that there's a kid named Maurice who knows something about this crime. They're interviewing other members of a family and they discover one of the people who lives in the house is Maurice. They bring him down. He tells the same story that he told at trial. So it is regrettable, I think, that the government doesn't have civilian witnesses, but in criminal activity, it's frequently the case that the only people who can really tell you what happened are those who participate. And so they make deals, and those deals are exposed in cross-examination at trial. The jury has a chance to develop oppressions of their credibility. Maybe if all we had was Alston or Bennett alone, this would be a different case. But we have Alston, we have Bennett, we have Montgomery, we have Maurice Thomas, we have the two girls. Breyer, was the judge who, the Superior Court judge who decided the post-trial motions, the Brady motions, the same judge as the judge who presided over the trial? It was not. Judge Scott presided over the trial. Judge Weisberg presided over the post-conviction motions. Judge Weisberg listened to all the evidence. He reviewed in detail the recantations, the allegations of police abuse. He heard from the detectives. He heard from Yarbrough. He heard from Alston and Bennett. And he concluded that Alston and Bennett's current recantations are nothing short of preposterous. He examined carefully the way that the evidence that they are currently saying matched against the evidence that they gave in the videotapes, and the videotapes are in the record. And I would urge the Court to look at the videotape of Alston's statement to the police in late November. Look at the videotape of Bennett's statement to the police in February. Bennett, when he's describing this crime and he gets to the culminating act, breaks down. He can't even talk about it. Alston similarly has an emotional reaction to it. They do not think that they're implicating themselves in the crime by describing the way that it unfolded and that it culminated in the alley, because they're not admitting what they actually did. They eventually realized that in the face of evidence that would be overwhelmingly likely to result in a conviction and a very long sentence, it was in their interest to cooperate. Defendants are perfectly able to, and they did, cross-examine at length to attempt to show that these motives to lie resulted in false testimony. But what they had incredible difficulty in doing is explaining why is it that all these people are telling stories from their own perspective of a group attack if it didn't happen. And that's what they would be confronted with if they tried to say, it's this McMillan guy. He ran into the alley later. He has two snatch-and-grab purse snappings. These crimes were nothing like the murder of Mrs. Fuller that occurred in the garage. Yes, he hit people, but they are a light year's different from the crime that actually occurred. They're so different that if the government had attempted to introduce those criminals' convictions as 404B evidence, we would have been shut down. They would come in only as propensity evidence under a very generous interpretation of third-party perpetrator defense in a case called Winfield by the D.C. Court of Appeals that lay a decade in the future. At the time of trial, there was no reason to think that those criminal convictions even would have come into evidence. Alitoso, what about the attack that Mr. Williams described? The McMillan's attack on the councilwoman? On the councilwoman, yes. I mean, she certainly was terrified, as I would be, too, if somebody came up and hit me in the face and grabbed, you know, a briefcase and ran off with it. But they were snatch-and-grab purse snatchings. They did involve violence, but they didn't involve somebody sticking around to beat somebody the way that Mrs. Fuller was beaten. Mrs. Fuller ended up as a victim of the attack. And I don't think that's very much like this. Well, I think the crime is actually quite different. Yes, there are some similarities. It's the neighborhood. He does drag somebody into the alley. But that crime, unlike this one, which involved an act with a pole, that crime resulted in McMillan being convicted of murder and sodomy, sodomy defined as a crime involving use of the sexual organ to commit the act. And he was seen running away from the victim, pulling up his pants. So I don't think that these are both horrible crimes and horrific acts, but they are very different in nature. I mean, what Levi Rouse was witnessed doing by four different people to Mrs. Fuller is more accurately described as torture. And therefore, I don't think that the Court should reach the conclusion that because McMillan's crime was somehow a signature crime, he actually is the one, even if the evidence at the time wouldn't show that. Even the defense expert at the post-conviction hearing conceded that these were not signature crimes. So what you really have here is speculative evidence that could have been deployed by a defendant. I doubt it would have been deployed by a defendant because they had such an obvious small group theory of the crime, Alston and Bennett, and only one of them argued it, and that was Rouse. And you can see why Rouse would do it. He had four eyewitnesses that are putting him right there in the scene committing the act. What else is he supposed to do? He also got on the stand and testified to an alibi that directly contradicted Charles Turner's alibi. Rouse has him being with him, with Turner, at a time when Turner says he's not with Rouse. Kagan. say that she certainly would have run with this evidence. And she's, you know, when you read some aspects of this transcript, again, you see that although the ten lawyers had ten different sets of interests, to the extent that there is a lead lawyer in this case, it's Michelle Roberts, who is the PDS lawyer, who was a woman of incredible skill and experience, and says she clearly would have gone with this evidence. Well, her client was acquitted. She's not before the Court as a Petitioner, and I agree with you that Michelle Roberts would have run with this evidence, and perhaps she would have tried to deploy it, but it would have been a very difficult sell to the rest of the defendants, and I think that the defense would have had considerably less force than the even very diminished force that I think it would have had anyway if somebody like Yarbrough is not going along with it. How is Yarbrough supposed to say to a jury, yes, I, you know, said to the police in a videotaped interview that there was a group of people in the park, and I was one of them, and many of the Petitioners are among them, and they left the park in order to follow a woman saying, let's get paid, that one, she's got big money. How is he supposed to do that defense? And you also would be asking the jury to say it's basically this mystery guy. No one has seen her with Mrs. Fuller. No one has seen her, seen him with any of her property. And to answer Justice Kennedy's question, what is he doing back there in the alley? He lives on the alley on 8th Street. This is a shortcut to his house. He's running in from the alley on 9th Street, what people have referred to as the cut in the alley, is a north-south route, so he takes the east-west alley, he goes up the cut of the alley, that's where he lives. What was he doing in the alley in the time? I think the prosecutor at trial said all we will ever know. We don't know. No one will ever know why he was running back and forth there. But why was his name not given to the defense? At the time, Justice Ginsburg, the policy of the Department of Justice was that we comply with our obligations under Brady, we comply with our obligations under the rules of discovery, and if it is not required to disclose information, we will not provide it. I think that, as Justice Sotomayor mentioned, this was raised by Michelle Roberts with the court. She said that she would pursue it later. What she was interested in determining was that the two guys that were seen by Freeman in the alley, Freeman being the one who discovered the body, were not her client. And she later argued that to the jury, because there was no evidence that they were her client. Now, today the Department of Justice has adopted a different discovery policy that exceeds what's required under Brady and this Court's cases interpreting it. That was adopted in the United States Attorney's Manual in 2006, and the Department devotes considerable resources to giving guidance, training, and supervision to prosecutors to go above and beyond Brady and disclose information that a defendant might wish to use, even if it's not required. Kennedy, I don't know that that is the advice that I would have given him, because   which it often does, such as witness safety or concerns about obstruction of justice. Providing that information to a defendant about the crime scene, about the general time frame in which it occurred, would be good practice, and it's the practice today. The question for this Court is whether there is a reasonable probability that the jury would have reached a different verdict if it had turned over the MacMillan evidence and the defendants had presented that MacMillan evidence to the Court. That is the same legal question that occurs both ex ante and ex post. Ex ante, it's harder for the government to know what the defense will do with information, and that's why a generous policy of discovery is good for the finality of criminal convictions as well as the fairness of the process. This Court encouraged it in Kiles v. Whitley in 1995. It specifically said, prosecutor anxious against – about tacking too close to the wind will turn things over in close cases. That is the better advice. That's the Department of Justice's advice today. But at the time, the prosecutor looking at the tenuous connection of MacMillan to the crime, the only evidence that we had were some statements from witnesses which were not enough to prosecute, that MacMillan was actually involved in the group attack, wasn't enough to prosecute him, but there was certainly nothing that suggested that he alone secreted in the garage was somehow engaging in the crime that six different witnesses told the jury had occurred as a group attack. And that was what he said to the judge. Michelle Roberts could have challenged that and asked for a ruling on it. It wouldn't resolve the Brady question, because the Brady obligation is the prosecutor's. It's not the responsibility of the judge. But the fact that the defendants didn't press forward on that shows that they had very little interest, I think, in trying to identify a mystery man as the person who had committed this crime alone, rather than taking the government's evidence as it seemed to be, which was a strong case of a group attack, and the question was which defendants were inculpated in it. And if the Court has no further questions, we submit that the Court should affirm. Roberts. Thank you, counsel. Mr. Williams, four minutes. Mr. Williams, could you list for me the legal errors the Court made below? Absolutely. There are three principal legal errors that the Court made below. First, it emphasized the reasons why a juror might disregard the evidence while ignoring reasons why the juror might not disregard the suppressed evidence. And I think the best place to find that in the Court's record is Petition Appendix pages 49a to 54a. Second, the Court below criticized the evidence here because it goes to the basic structure of how the crime occurred. That's at page 54a. I'm sorry. Go through that one again. Sure. The Court criticized the suppressed evidence because it goes to, quote, the basic structure of how the crime occurred. Our response is exactly, and that makes it particularly probative. It shows how this whole case would have been cast in a different light if Petitioners had had access to that information. It would have presented an alternative theory. And third, there is an assumption running through the Court's decision below that the jury found the government's witness is credible. Well, that's because the jury only heard half of the evidence. And even then, the jury deliberated for a week before it returned any verdicts, and it was a split verdict. Is that a legal error? It sounds like a factual error. Well, no. I think it is a legal error, Your Honor, if you look at Parker v. Gladden, which is a case from this Court in 1966. It's a per curiam opinion. But this Court held in that case that the length of jury deliberations suggests that the jurors have doubts about the guilt of the accused. So, yes, we would submit that that is, in fact, a legal error. But if you want to consider it an error of analysis, so be it. We think that those are the three principal errors in the decision below. If I may, I'd like to make four quick points before I step down. First, in answer to your question, Justice Kagan, there was a civilian witness. It was William Freeman. And he was standing at the corner of 8th and H all day. He said that there was no group attack. He did not see any group cross the alley. He did not hear any screams from the alley. He had no reason to think that this group attack had occurred. That was testimony in the record from the only civilian witness, the only person who did not have reason to fabricate testimony as a young, inarticulate witness who is being pressured by police to inculpate himself or his friends. Second, the government focused a great deal on Mr. Montgomery. Mr. Montgomery is a perfect example of these types of witnesses. Mr. Montgomery was a drug dealer who spoke to police only after being threatened with arrest and then admitted on the stand that he only named people who had already been arrested. That would weigh on the mind of a jury. They would think that that is a – that all of that testimony is a reason why he might fabricate – fabricate evidence. Third, the government focused on Mr. Yarbrough's statement. I remind the Court that the jury was instructed to weigh that evidence with caution. That's at page 859 of the hard copy appendix, A859. And the fact that after deliberating for seven days, the jury asks to look at that information shows that the prosecution's theory here, that there was clear evidence of guilt against some people, isn't true, because they keep on pointing to Mr. Yarbrough, but after seven days of deliberation, the jury wants to look at evidence regarding Mr. Yarbrough, and that's the last thing they do before they return any verdict. Last, overall, the one thing you did not hear Mr. Grieben mention very much was the objective crime scene evidence. The objective crime scene evidence, in addition to the alternative perpetrator theory, would have presented an overwhelmingly powerful case of innocence. It certainly would have been enough to be a reasonable probability of the jury finding reasonable doubt, and that's all the information needs to establish. As we pointed out in our brief, the purported eyewitnesses got the injuries to the victim wrong. If you look at page A1191, as I asked you to look at before, it makes that clear. They got the location of the sodomy in the garage wrong. The government's theory at trial on that was wrong. The government has never sought to explain how it can correctly explain where the sodomy occurred. Thank you. Roberts. Thank you, counsel. The case is submitted.